### ELBERT PULLEN v. THE STATE.

*No. 3231.    Decided October 23.*

**Murder—Fact Case.**—See the statement of the case for evidence *held* insufficient to support a conviction for murder of the first degree.

APPEAL from the District Court of Tyler. Tried below before J. F. Lanier, Esq., Special Judge.

The conviction in this case was in the first degree for the murder of Louis Drake, the penalty assessed by the verdict being a life term in the penitentiary.

Caroline Chambers was the first witness for the State. She testified in substance that she was in the town of Woodville, Tyler County, at the time of the homicide—which by the indictment is alleged to have occurred on June 11, 1889—and at about seven o'clock on the evening of that day went to the house of John Clark. She found the defendant at the house of said Clark, and borrowed his pocket knife for temporary use. It was the knife now exhibited in evidence—a large pocket knife with a "hawk-bill" blade. She remarked to the defendant that it was a "mighty big knife." Defendant replied, "That is the kind I always

tote." Witness returned the knife after using it, and defendant left. Between nine and ten o'clock that night he returned to Clark's house in company with Tony New, Jim Walters, and Nep Boyd. Soon afterwards the deceased, very much under the influence of whiskey, arrived. He remained but a short while. Soon after the deceased left Clark's house, the witness and a woman named Bess started to town to get some whiskey for a sick person. At a china tree near Barclay's saloon Bess left the witness, going off with a man, and witness got John Clark, whom she met, to go into Barclay's saloon and get the whiskey for her. While waiting under the china tree, no person being with her, the witness saw the defendant and Tony New approaching her from the direction of Clark's house, and going towards the saloon. At about the same time she saw the deceased approaching from the direction of the saloon. When defendant and New reached a point opposite the witness they stopped and held a brief whispered conversation, which witness could not hear. New then called to deceased to lend him some money. Deceased replied that he could not accommodate New, as he was in Woodville attending court, had no idea how long he would have to stay, and had no more money than he needed. New replied, "Yes, by God, you asked me for money the other day on Spring Creek, and I gave it to you. Now, I ask you for money, and you won't lend it to me." Defendant then said to deceased, "Yes, lend us some money. We have been gambling, are broke, and need some money." Deceased, who was very drunk, replied to defendant, "You God d—d son-of-a-b—h, you can't have my money." Defendant in reply said, "You call me a God d—d son-of-a-b—h? I will lay your d—d body down before morning, and we will have all your money." Deceased asked defendant, "What do you mean?" Defendant laughingly replied, "Oh, nothing. That is just a way we have of talking." Defendant and New then went off in the direction of the barber shop, near the saloon.

Continuing her testimony, the witness said that she remained at the tree but a few minutes after the defendant and New left, and she then went to the saloon. In passing from the barber shop gallery to the saloon gallery she saw defendant "down on the ground" trying, apparently, to open his knife. About the time she reached the gallery the defendant placed his hand, in which he held the open knife, on the said gallery and asked her, "Caroline, do you know where that man went that we tried to get money from awhile ago?" The witness replied that she did not, and passed into the saloon. At that moment she observed Ben Charlton standing on the barber shop gallery. She got the whiskey at the bar and almost immediately left the saloon through the door she had entered. She found Charlton where she had left him on the barber shop gallery and invited him to go to Clark's with her. They started, and had gone but a short distance when she discovered that she had left her

handkerchief in the saloon. She accordingly returned to the saloon, leaving Charlton near the china tree. She found the saloon door closed but not locked. She opened the door, passed into the saloon, and to the bar, where she got her handkerchief. She then became engaged in a conversation with Mr. Will Barclay and others and remained there talk-ing between two and three hours. When she started home Mr. Barclay opened the door for her, and as she stepped out she discovered the deceased lying face down on the gallery. The discovery startled her, and she exclaimed, "Mercy! Look there!" She then passed on, joined Charlton at the china tree, and thence went with him to Clark's house. Reaching Clark's place she saw a light burning in a little outhouse. She went into the house at once and went to bed. While undressing she heard New in the yard calling to her. He called to her to come to him in the yard, that he wanted to see her. She replied that she was ready to go to bed and could not go to him. It was then one or two o'clock.

On her cross-examination the witness stated that when first called before the grand jury she refused to and did not tell the facts to which she testified on this trial, her reason being that she did not want to tell what she knew and saw. She did not tell the grand jury what she knew and saw until she was placed in jail and kept there several days. The foreman of the grand jury asked her if she saw the deceased down town on the fatal night. She replied to that question by stating that she saw him at Clark's house on that evening. She was then asked if she knew who killed the deceased, or if she knew anything about the killing, to which questions she replied in the negative. Lights were burning in the saloon and barber shop when witness discovered the body of deceased on the saloon gallery. She did not then know that deceased was dead. She saw no blood on the gallery at that time. Her exclamation, "Mercy! Look there!" was prompted doubtless by what, when standing near the china tree early in the night, she heard the defendant say to the deceased. The witness denied that she ever told George Pullen, the brother of the defendant, that a "whiter man than Elbert Pullen killed Louis Drake." Tony New is a white man.

Ben Horn was the next witness for the State. He testified in substance that he spent the night of the homicide at the house of the defendant in Woodville. When the defendant came home to his supper on that evening he found the witness and Dick and Irvin Dill, Rose Pullen, Anna Guyton, and the children sitting on the gallery. He then borrowed the witness's knife, the same being the knife now in evidence, and soon afterwards left, remarking that he had to go back to town. It was late on that night when the witness next saw the defendant. At that time defendant was moving about the house with a light in his hand. On the next morning the witness discovered his knife in his pocket—somebody having "slip-

ped " it into said pocket during the night. The knife had not been recently used to butcher anything.

On his cross-examination the witness said that he was at Young's saloon, where the defendant worked, early in the afternoon preceding the fatal night. While there he loaned his watch and knife to defendant, but defendant soon returned the knife. Mr. Young and Sammy Isbell were present. The witness could not say what time it was when defendant came home on the fatal night. He went to his work at Young's saloon, as customary, on the next morning. Witness could discover nothing unusual about him.

Dick Dill testified for the State that he was one of the parties sitting on defendant's gallery when defendant came home to supper on the fatal night. If defendant borrowed or got a knife from Ben Horn at that time the witness did not know it, and did not think that defendant could have done so without his knowledge. Witness slept with Irvin Dill and Ben Horn at defendant's house on that night, and heard defendant when he came home, but he could not say what time it then was.

Nep Boyd testified for the State that he and the defendant, New, and others left deceased at Barclay's saloon at about eleven o'clock on the fatal night and went to a house near John Clark's place where they gambled until about twelve o'clock. They then went back to Barclay's saloon, where the witness again saw the deceased together with several other parties. Witness then took Mr. Fowler to the hotel, and when he presently returned to the saloon he found the deceased lying on the gallery. He remarked, "This man has gone to sleep very quick;" and presently he and the defendant, New, and others returned to the house on Clark's place and resumed gambling. After the gambling party broke up the witness and defendant went off together. They separated near Clark's house, defendant saying that he was going home. He was squatted down in a weed patch, answering a call of nature, when witness left him. He did not see defendant again until the next morning.

On his cross-examination the witness said that he saw a large number of people about Barclay's saloon each time that he saw the deceased there. He saw Caroline Chambers at the said saloon on that night and also saw her near the china tree. He did not see the defendant with a knife on the fatal night, nor did he ever hear defendant utter a threat against deceased. Defendant lost about thirty-five cents by the gambling. Witness assisted in dressing the body of the deceased. The pockets of the clothes on the body were found turned wrong side out.

Medical testimony showed that the death of Drake resulted from a knife stab or cut in the throat. The jugular vein was completely severed. One of the physicians testified that he examined the knife in evidence on the morning after the homicide. He found a substance in the nail-cut which

resembled dry blood, but he could not state positively that the substance was blood.

M. L. McAlister testified for the State that he visited and examined the premises of the defendant on the morning after the homicide. He found a substance on the door which resembled blood, but he was not positive that it was blood. He thought the spots he saw were the prints of bloody fingers. The State closed.

J. S. Isbell was the first witness for the defense. He testified in substance that he was the bartender at C. A. Young's saloon, at which establishment the defendant was employed as glass-washer. Defendant, Ben Horn, and other negroes were in the said saloon on the evening of the fatal day. During the time they were in the said saloon the witness saw the defendant borrow a large knife from Ben Horn, which knife was returned to Horn before he, Horn, left the saloon to go to supper. Defendant soon afterwards went to supper and returned. He again left the saloon about 9 o'clock, and did not return until next morning. He then had on, according to witness's recollection, the same clothes he wore the night before. Previous to leaving the saloon on the fatal night the defendant got twenty-five cents from Mr. Young, and on the next morning Mr. Young paid a man twenty-five cents by request of defendant.

Rose Pullen, the wife of defendant, testified in his behalf that she was on the gallery of her house when defendant came to supper on the fatal night. She knew as a matter of fact that defendant did not get a knife from Ben Horn at that time. He did not stop on the gallery where Horn and others were then sitting, but went into the house, ate his supper, and went immediately back to town. The witness was awake when he came home late on that night, and knew, as an absolute fact, that he did not go near the bed in which Horn was then sleeping. Anna Guyton, the sister of the defendant, testified substantially as did the witness Rose Pullen.

W. A. Barclay testified for the defense that he was the proprietor of the saloon alluded to by previous witnesses. Among the large number of people who were alternately in and out of his saloon on that night were the defendant and deceased. Deceased at different times had as much as a dollar and a half or two dollars in his hand. He "treated" several times. Caroline Chambers was in witness's saloon for several hours, and left the saloon at the same time the witness did after closing for the night. When witness, Caroline, and others left the saloon at about 3 o'clock, the witness saw deceased lying on the gallery, apparently asleep. He heard no exclamation from Caroline, and directed no particular attention to deceased. He went home and to bed, and when he returned to his saloon early on the next morning he found deceased's body on his gallery. Deceased may, for aught the witness knew to the contrary, have been dead when he, witness, saw him at 3 o'clock. The wit-

ness heard no disturbance, no quarreling, and no groaning or moaning on that night, and he thought he would certainly have heard any disturbance on his gallery had any occurred before be closed his saloon.

C. A. Young testified for the defense that the defendant, who was in his employ, left his saloon at about 9 o'clock on the fatal night and did not return until at the usual hour on the next morning. He was then wearing the same clothes he wore on the previous night. When defendant left the saloon on the fatal night the witness gave him twenty-five cents, and on the next morning, at his request, paid a man twenty-five cents which he said he borrowed on the night before.

Ben Charlton was the next witness for the defense. The material part of his testimony was to the effect that he was standing on his gallery, adjoining the gallery of Barclay's saloon, at the precise time that Caroline Chambers went into the said saloon the first time on the fatal night; that he was then in a position to see anybody on the ground between the barber shop and the saloon, and to hear any conversation between Caroline and any other person on the saloon gallery. He saw nobody between the barber shop and saloon at that time and heard no person speak to Caroline as she passed into the saloon. The witness remained at the china tree from the time that Caroline left him there until she came out of the saloon and went to Clark's house with him, which time covered the three hours immediately preceding Caroline's discovery of the deceased lying on the gallery. If during that time the defendant had been about the said gallery the witness would certainly have seen him. He saw quite a number of people during that time passing in and out of the saloon, but did not see the defendant.

*S. B. Cooper*, for appellant.

*W. L. Davidson*, Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE.—This appeal is from a judgment which has condemned appellant to the penitentiary for life for the alleged murder of one Louis Drake.

A conviction was had upon evidence entirely circumstantial. We have given the evidence as disclosed in the record our most mature consideration, and it fails to impress us with that probative force, cogency, and conclusiveness, such as should command our confidence in the justice and correctness of the verdict and judgment rendered. Appellant may be guilty of the terrible crime of which he has been convicted, but in order to establish his guilt the law requires that the evidence should exclude to a moral certainty every reasonable doubt that the accused, and no other person, committed the crime, and exclude every other reasonable hypothesis than that of his guilt. Pogue v. The State, 12 Texas Ct.

App., 283; Lovelady v. The State, 14 Texas Ct. App., 545; Kunde v. The State, 22 Texas Ct. App., 65; Dugger v. The State, 27 Texas Ct. App., 95; Monk v. The State, Id., 450; Willson's Crim. Stats., sec. 1057. We do not think the appellant should he held to be legally convicted upon the evidence exhibited in the record before us, wherefore the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Hurt, J., absent.